**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - -X

In re:   Andrea M. Nolan,

            Chapter 13
            Case No.  04-35987 (RTL)

   Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - -X

**OPINION**

**APPEARANCES:**

Paul S. Pflumm, Esq.
Melinda D. Middlebrooks, Esq.
Middlebrooks Shapiro Nachbar & Pflumm, P.C.
Attorneys for Debtor

Howard Schmidt, Esq.
Attorney for Chapter 13 Trustee, Michael B. Kaplan, Esq.

**RAYMOND T. LYONS, U.S.B.J.**

   This proceeding comes before the court by order of the District Court remanding the matter regarding the fee application of Middlebrooks Shapiro Nachbar & Pflumm, P.C., ("Applicant"), Attorneys for the Debtor, Andrea Nolan. After conducting a hearing in conformance with the District Court's order, and upon further findings of fact and conclusions of law, this court reaffirms its decision that the amount of time charged for defending a motion to vacate the automatic stay was grossly excessive and Applicant has failed to satisfactorily supplement its application to support such charges. The Trustee's objection to counsel fees is sustained.

**JURISDICTION**

This court has jurisdiction of this fee application under 28 U.S.C. § 1334(b), 28 U.S.C. § 157(a) and the Standing Order of Reference by the United States District Court for the District of New Jersey dated July 23, 1984, referring all proceedings arising under Title 11 of the United States Code to the bankruptcy court. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), matters concerning the administration of the estate.

**FINDINGS OF FACT**

Applicant filed a voluntary Chapter 13 petition on behalf of the Debtor, Andrea Nolan, on August 9, 2004. The disclosure of compensation filed under Rule 2016 revealed that applicant agreed to accept $2,500.00 for its services of which $300.00 was paid up front. A written fee agreement likewise specifies a $2,500.00 flat fee but requires payment in full in advance. To date, Applicant states it has received $2,264.75, which is being held in an escrow retainer account. Among the services excluded from the flat fee were defense of motions for relief from the automatic stay.

Counsel for the Debtor submitted its first interim application for fees and reimbursement of expenses on March 21, 2005. The application included a breakdown of the services provided in connection with the flat fee under the retainer agreement, attached as Exhibit A to the application for compensation.[1] The application also included a breakdown of additional services rendered that were not part of the work done pursuant to the flat fee given for the retainer, but instead were services that resulted in additional billing, attached as Exhibit B to the application. The fee requested by Applicants

---

[1] The application stated the flat fee as $2,000.00, not $2,500.00 as disclosed in the Rule 2016 statement. Testimony confirmed that this was a typographical error.

is $6,966.00, plus costs, in addition to the flat fee of $2,500.00. The Chapter 13 Trustee, Michael Kaplan, objected to the application citing the following reasons:

> (1) Items set forth as time billed should be part of Standard fee for handling of Chapter 13 case;
> (2) There are excessive periods of time charged to prepare documents and review of correspondence;
> (3) There are excessive periods of time charged for correspondence and/or travel;
> (4) There are excessive periods of time charged for court appearances;
> (5) The nature of the work performed does not justify the time spent;
> (6) Fees sought are disproportionate to the size and complexity of the case; and
> (7) This case was filed in August, 2004, and confirmed on January 18, 2005, as a sale or refinance plan. There were no significant legal issues which would justify the fees sought, nor time spent. Debtor's counsel is grossly over-billing the case. The standard fee of $2,000.00 is more than adequate.

Applicant submitted a written response to the Trustee's objection, but did not appear at the hearing on May 3, 2005.

After review of the application and accompanying documents, this court sustained the Trustee's objection, and wrote:

> I have reviewed your firm's application for compensation, the objection by the standing chapter 13 trustee, and your response thereto. I am sustaining the trustee's objection and denying your firm's fee application. The amount of time spent defending a motion to vacate the automatic stay was so grossly excessive as to warrant a total denial of the fee application.

The Applicant appealed the decision to the District Court which remanded the proceeding back to this court to give the Applicant an adequate opportunity to defend its fee application with legal arguments and/or evidence.

As the circumstances surrounding the underlying bankruptcy case are somewhat unusual, a brief recitation of those facts will follow. The Debtor divorced on September 20, 1999. At the time of the divorce, Debtor was unemployed, having been the primary caretaker of the two children, approximately eleven and eight years old at the time of the divorce. The divorce agreement provided that the marital home would be transferred to Andrea and that alimony and child support payments would be made by Joseph in the amount of $4,300.00 a month so that Andrea would be able to pay the mortgage and other monthly expenses for herself and the children.

Joseph Nolan filed a Chapter 7 bankruptcy on May 15, 2004.[2] During the course of his bankruptcy case, Middlebrooks Shapiro Nachbar & Pflumm, P.C., substituted in as counsel for Joseph Nolan on August 25, 2004. Shortly before that, Middlebrooks commenced its representation of Andrea Nolan in her bankruptcy case which was filed on August 9, 2004.[3] According to Andrea's bankruptcy petition, the majority of her income was derived from the alimony payments that were supposed to be made in the amount of $4,300.00 a month. She also received gross pay of $958.56 a month from employment at a department store. At the time of the August filing, Andrea was behind on forty-one months of mortgage payments according to the proof of claim filed by the mortgagee. The

---

[2]The court was not aware that Applicant represented both Andrea Nolan and her ex-husband, Joseph Nolan, in separate bankruptcy cases until preparing for the evidentiary hearing on this fee application following remand. Since the fees related to defense of a motion for relief from the automatic stay, the court reviewed Applicant's 3-page letter brief dated January 18, 2005. That letter disclosed that Joseph Nolan was a debtor in case # 04-26639, but not that Applicant was also his attorney.

Although Andrea's schedules of assets do not show any claim for alimony or child support (Schedule B, Item 16 is marked "None"), Joseph's schedules of liabilities list Andrea as a priority creditor for alimony.

[3]Andrea Nolan, proceeding pro se, had filed her first bankruptcy petition on June 14, 2004, which was subsequently dismissed and re-filed by the Middlebrooks firm.

4

plan filed on August 24, 2004, provided that Andrea would pay $150.00 a month to the Trustee which would go to cure the pre-petition debt on the mortgage. The plan also provided that Andrea would pay the regular monthly mortgage payment outside the plan at $3,200.00 a month until a sale or refinance of the home on or before April 1, 2006.[4] It is evident that success of the plan hinged on continued alimony payments from Joseph Nolan.

The mortgagee, Eastern Savings Bank, objected to confirmation on December 15, 2004, based on Andrea's failure to make post-petition payments and the perceived inability to stay current under the plan. On January 7, 2005, Mortgagee made a motion for relief from the stay due to continued failure to make post-petition payments. Applicant docketed opposition to the stay relief motion on behalf of the Debtor, Andrea Nolan, on January 18, 2005. The opposition is a three-page letter brief (citing no cases) that clarifies certain facts regarding the filings of two separate petitions, one by Joseph Nolan and the other by Andrea Nolan, and goes on to oppose the stay relief motion based on the argument that the cashier's checks that had been sent to the Mortgagee inadvertently included the wrong account number and therefore could not be cashed, and also explains that Andrea Nolan received a commitment for a refinance. The Clerk of this court contacted the Applicant to advise that the court had adopted a mandatory form of certification of debtor in opposition to a motion for relief from the automatic stay. The following day, Applicant docketed a supplemental response which was a two-page form-certification of the Debtor that simply required that certain boxes were checked and brief additional responses be added where necessary. On January 25, 2005, Mortgagee submitted a two-

---

[4] This plan was confirmed on March 11, 2005.

page response to the opposition. The result of the stay relief motion and these subsequent related filings was the entry of a consent order on February 18, 2005, which provided that the parties agreed to certain terms and conditions that would allow the Debtor to make payments and then refinance on or before August 15, 2005.

Following remand, Applicant filed a brief in support of the fee application. Applicant states that the stay motion was based on a failure on the part of the Debtor to make post-petition payments and concedes that the motion did not raise any unusual or complex legal issues. Rather, Applicant posits that the need to bill excessive time for the stay motion was due to extraordinary time spent contacting the Debtor's ex-husband in continued efforts to get him to make alimony payments in accordance with the property settlement agreement so that the Debtor would have the money to make the mortgage payments. Despite repeated and unsuccessful attempts to get the Debtor's ex-husband to make payments, Applicant did not bring an action against the ex-husband in matrimonial court to enforce the property settlement agreement believing such action would not produce results in time to save the Debtor's home.[5] It is also relevant to note that Applicant was representing the Debtor in her

---

[5]Defendant's Brief at pages 1-2 reads:

> Joseph Nolan failed to make the required mortgage payments and a foreclosure action was instituted against the Debtor, resulting in the filing of the instant Chapter 13 case on August 9, 2004. The Chapter 13 Plan was funded by Joseph Nolan. The Debtor continued to rely upon her former spouse to pay post-petition mortgage payments. In essence, the Debtor entered into bankruptcy to give Joseph Nolan an opportunity to cure his defaults. In fact, Joseph Nolan's contribution letter committed him to paying the Chapter 13 Plan payments.
> The filing of this Chapter 13 case did not suddenly cure Joseph Nolan of his habitual lateness in meeting, or even complete failure to meet, his

6

bankruptcy case while also representing the ex-husband, Joseph Nolan, in his separate bankruptcy case, case # 04-26639-NLW.[6]  The court conducted an evidentiary hearing.  Stuart Nachbar, a partner in the Middlebrooks firm, testified that he did all of the legal work in opposing the stay motion.  He readily admitted that, although he was an experienced attorney, this was one of his first Chapter 13 cases.

---

> obligations to the Debtor.  As a consequence, the Debtor was unable to make post-petition mortgage payments or the required payments to the Standing Chapter 13 Trustee.  Given those facts, the inevitable stay motion was filed in January 2005. []
>
> The stay motion itself was based on failure to make post-petition payments.  Middlebrooks Shapiro Nachbar & Pflumm, P.C. ("MSN&P"), does not dispute that the stay motion was legally unremarkable, raising no unfamiliar legal issues.  In fact, the only real defense to the motion possible was payment of the post-petition arrears, whether immediately or by agreement with the secured creditor.  Therefore, MSN&P negotiated a settlement providing for payment of the arrears.  In order for the Debtor to pay those monies, she needed Joseph Nolan to meet his obligations.  This Firm, therefore, sought the necessary money from Joseph Nolan.
>
> While time was spent negotiating with creditors and preparing papers, even the most superficial review of the billing records will reveal that the vast majority of the time has been spent cajoling Joseph Nolan to meet his obligations.  Throughout this case, Joseph Nolan has never denied liability.  In fact, his repeated tactic has been to promise payment and then fail to come through.  He makes appointments, promising that he will bring the necessary money.  He occasionally arrives as scheduled, but that is the exception.  Even when Joseph Nolan does appear, he is often without the money, but with an elaborate story and new promises.  Multiple phone calls regarding when MSN&P will receive the monies follow.  The pattern continues to the present.
>
> While the Debtor could have brought an action to enforce the property settlement agreement in the matrimonial court, that alternative was unlikely to produce results within the time limits created by the bankruptcy.

[6]The stay relief motion that is the subject of the fee application in issue was filed on January 7, 2005, resulting in a consent order on February 18, 2005.  It is evident that the representation of Joseph Nolan was simultaneous since his case was not closed until February 15, 2005.  Also, Joseph Nolan scheduled Andrea as a priority creditor in his case.

7

Applicant called as an expert witness Karin Haber, a family law attorney who had served on her county fee arbitration committee. She testified that attorneys in non-bankruptcy matters charge for the time they spend on the matter where an unreasonable client or adversary may require more time than might be expected. Also, attorneys in non-bankruptcy matters charge for time spent traveling to, and waiting to be heard in, court. Ms. Haber also acknowledged that she handled some high-volume matters, such as landlord-tenant summary dispossess proceedings, on a flat-fee basis regardless of time spent. Those types of matters could only be handled on a high-volume basis because it would not be efficient or economical to handle one matter at hourly rates.

Following conclusion of the hearing on April 27, 2006, the Applicant requested leave to submit a copy of the written conflicts waivers signed by Andrea Nolan and Joseph Nolan. A letter brief attaching the waivers was filed on July 5, 2006.

## DISCUSSION

This court has previously addressed the proper means for determining fees in a Chapter 13 case. *In re Szymczak*, 246 B.R. 774 (Bankr.D.N.J.2000). In cases where additional fees are requested, the court first determines an appropriate fixed fee for work that is "normal and customary." *Szymczak*, 246 B.R. at 781. For work that falls outside that standard, additional fees are calculated using the lodestar approach. *Id.* The lodestar approach has been described by the Supreme Court as "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The reasonable hourly rate is based on "prevailing market rates in the relevant community." *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir.1990), *citing Blum v. Stenson*, 465 U.S. 886, 895, 104 S.Ct. 1541, 79 L.Ed.2d

891 (1984).

The lodestar method is not the sole means of analyzing a Chapter 13 fee application because this court recognizes that "a lodestar analysis is unnecessary and may in fact be misleading when a real market rate for certain routinized services exists and can be used directly as a means of measurement of the market rate." *Szymczak*, 246 B.R. at 779, *citing In re Patronek*, 121 B.R. 728, 731-32 (Bankr.E.D.Pa.1990). Such is the case for Chapter 13 fees. Since a lodestar approach is not appropriate in a Chapter 13 case, the review of a fee application where additional work is involved must be looked at in two parts: first, a determination of the fixed fee for work that is normal and customary; and second, application of the lodestar approach.

**Fixed Fee: Normal and Customary**

For attorneys filing Chapter 13 cases, the work involved becomes "normal and customary," because although the facts and parties differ, "the underlying legal issues involved in a chapter 13 case involve the same, or substantially similar, legal issues." *Szymczak,* 246 B.R. at 780. For such work, a reasonable fixed or flat fee is to be used which is arrived at by determining "those fees typically charged by attorneys who regularly practice in the bankruptcy court's jurisdiction." *Id.* Determining comparable services in this context is guided by the Third Circuit's decision in *In re Busy Beaver Bldg. Ctrs., Inc.*, 19 F.3d 833, 841 (3d Cir.1994), which developed a "market approach" for professional fees.

One bankruptcy court explained the *Busy Beaver* "market approach" as a consideration of three factors: (1) what is requested by the professional person; (2) the level of expertise or experience required to perform the tasks in issue and how well they were performed; and (3) typical charges from

9

other professionals with similar experience and expertise facing similar problems who perform with a level of competence comparable to the applicants. *Szymczak*, 246 B.R. at 781, *citing In re Dubin Paper Co.*, 169 B.R. 115, 122 (Bankr.E.D.Pa.1994).

Here, the Applicant entered into a retainer agreement with the Debtor that provided for a fixed fee of $2,500.00. In connection with the retainer fee, Applicant has provided the court with a summary of the services rendered. The summary shows that a total of 31.40 hours were expended for such actions as contacts with the client including meetings, correspondence, and phone calls; preparation of a Chapter 13 petition, plan and schedules; attendance at the §341 meeting of creditors; review of the proofs of claim; and attendance at the confirmation hearing. In a Chapter 13 case, such services are considered normal and customary. The amount of $2,500.00 is typical for Chapter 13 cases filed in this jurisdiction. For those reasons, the Applicant is entitled to keep the $2,500.00 retainer fee.

**Lodestar: Beyond Normal and Customary**

For services provided by an attorney that go beyond what is normal and customary, the court will use the conventional lodestar method to determine an appropriate fee. As previously stated by this court, "Chapter 13 debtors are typically charged additional legal fees for such matters as the defense of a motion to lift the automatic stay, objections to claims, cramdown of undersecured mortgages, and settlement of objections to confirmation." *Szymczak*, 246 B.R. at 782.

Here, Applicant states that it provided an additional 33.10 hours in connection with services that went beyond what is normal and customary. The additional hours expended were billed for having to respond to an objection to confirmation and a motion to lift the automatic stay. The vast majority of

these fees pertained to the automatic stay motion. Defense of both matters are recognized as services that deserve additional legal fees. However, it still has to be determined that the number of hours spent on these matters was reasonable and the rate charged for these hours was also reasonable. As this court has previously stated: "[s]imply because an attorney spent time, does not mean it is compensable or that counsel used the most economical means of rendering the services." *Id.* Further, the *Hensley* Court "admonished that attorneys, in applying for fees, 'should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission.'" *Id.* at 782-83, *quoting In re Stromberg*, 161 B.R. 510, 517 (Bankr.D.Colo.1993) (*quoting Hensley v. Eckerhart*, 461 U.S. at 432-34, 103 S.Ct. 1933).

As stated by Applicant itself, the additional time spent on the confirmation hearing was minimal and the stay motion itself was "legally unremarkable, raising no unfamiliar legal issues." Defendant's Brief at pp. 1-2. Rather, Applicant states the billing on the stay motion was appropriate where "the vast majority of the time [was] spent cajoling [the ex-husband] to meet his obligations." Defendant's Brief at p. 2.[7] The court finds it incredulous that the Applicant would bill the "vast majority" of 33.10

---

[7]Further, Defendant's Brief at pages 4-5 reads:

> The vast majority of the fees requested arose from the Stay Motion. Eastern Savings Bank's Stay Motion was based on failure to make post-petition payments. As described in the factual background, this Firm does not dispute that the Stay Motion gave rise to any unfamiliar or legally unique issues. The letter brief filed in opposition to the Stay Motion consists entirely of factual disputation of the alleged arrears and an explanation of the Debtor's reliance on Joseph Nolan's obligation to pay the Debtor's mortgage.
> It is the facts of this matter which are unusual. The Debtor's divorce

hours for chasing around the Debtor's ex-husband for payment due under a divorce agreement. Especially in light of the fact that those efforts proved fruitless, the court again raises the issue as to whether these efforts were also problematic where Applicant was concurrently representing the ex-husband.

Despite the unimpressive procedural history explained *supra*, the billing records of the Applicant show a grossly excessive amount of time billed. Applicant spent 0.75 hours reviewing the motion for relief from the stay. Applicant then spent 7.20 hours preparing and filing opposition to the

---

> from her former spouse left him responsible for the Debtor's mortgage. In fact, her monthly income is only one third (1/3) of the monthly mortgage payment, so she had no hope of making her mortgage payments when he failed to meet his obligation to assist her. This led to endless cajoling of Joseph Nolan to meet his obligations, cajoling usually met with fulsome promises and a notable lack of performance.
> 
> The Standing Chapter 13 Trustee has suggested that the services would have been more appropriately categorized as matrimonial work. However, as indicated above, having the Debtor seek relief from the matrimonial court would not have stayed the foreclosure action. Nor has the Standing Trustee explained why a categorization as matrimonial work should result in a denial of compensation.
> 
> Joseph Nolan's delays in payment, even after an agreement was reached with Eastern Savings Bank, exacerbated the fees. His lateness in fulfilling the terms of the settlement, resulting in the filing of a Certification of Default and necessitated a successful effort to seek more time for him to pay, further increasing fees.
> 
> These communications with Joseph Nolan were necessary to save the Debtor's home, given her reliance on him. The alternative, commencing legal process in the matrimonial court would be unlikely to produce any result in time to save the Debtor's home. There is already a Judgment of Divorce requiring Joseph Nolan to pay the mortgage, it would require enforcement and collection, a notoriously slow process. We doubted that Your Honor would deny relief to Eastern Savings Bank, while that process wound its way through the matrimonial court.

motion along with the Debtor's certification. It should be noted that Applicant charged 0.20 hours and 0.25 hour for filing the same document twice. An additional 0.40 hours were spent reviewing the subsequent response to the opposition. And 0.30 hours were spent reviewing the resulting consent order. In connection with the motion for relief from the stay, Applicant spent a total of 0.45 hours leaving two separate phone messages; a total of 3.40 making telephone calls to the Debtor, the ex-husband, and the creditor's attorney; and spent 4.50 hours corresponding with the same individuals. It should also be noted that on two separate occasions, Applicant had a telephone conversation with Joseph Nolan and then on the same day also had office meetings with him. Also, in the span of two days, Applicant made four billing entries for the same correspondence with Jerold Feuerstein, Esq., attorney for the creditor. All of these entries were charged for despite being duplicative. Applicant charged 0.75 hours for inter office meetings and 2.6 hours for meetings Applicant had with the Debtor's ex-husband. Applicant further charged 3.75 hours travel time to and from court along with 2.0 hours for a court appearance on the motion for relief from the stay. Along with general entries for review of the file, this totals over 30 hours billed for a stay relief motion, which resulted in a charge of almost $7,000.00.

To put this charge in perspective, the United States Bankruptcy Court for the District of New Jersey provides on its website a list of what are commonly referred to as "no look" fees, essentially a list of fees for routine Chapter 13 services that require little court review. The amount allocated on this form for defense of a motion on behalf of the debtor is $250.00. In this district, an average of over 14,000 Chapter 13 cases per year have been filed during the last five years. Many, if not most, of these cases involve debtors trying to save their homes through a plan to cure arrears on their mortgage.

A large number of those debtors have trouble keeping up with their payments and motions by mortgagees for relief from the automatic stay are common. Lenders' attorneys are routinely awarded fees of $250.00 for prosecuting such motions. Conversely, debtors object to such motions so frequently the court has adopted a form of debtor's certification in opposition that can be downloaded from the court's website. Furthermore, a form of order resolving such a routine motion is, likewise, available on the court's website. Applicant should have used the court's form of debtor certification in opposition to the stay motion and negotiated a settlement using the court's form of order, all without filing a letter brief or making a court appearance.[8] This is a classic case of an inexperienced attorney reinventing the wheel where a knowledgeable Chapter 13 practitioner could have accomplished the same result with little effort and would accept the "no look" fee of $250.00.

This court finds that because of the nature of the work and the time spent by the Applicant to defend a motion for relief from the stay are grossly excessive, the request for additional fees is denied.

**Conflict of Interest**

In addition to the problematic fee application, this court also questions the propriety of Applicant's dual representation of Andrea Nolan and Joseph Nolan in their separate bankruptcy cases. As stated previously, it was only during the court's preparation for the evidentiary hearing regarding the fee application following remand that the court discovered the Middlebrooks firm was representing Andrea and Joseph simultaneously. This fact was not previously disclosed to the court. The court asked Applicant to submit why such dual representation would not be a conflict of interest. Applicant

---

[8]Cajoling the ex-husband to pay alimony will be addressed below.

submitted a letter brief along with signed copies of conflict waivers from both clients.

This court recognizes that the potential for conflicts in dual representation alone is not enough to find that the representation is improper. *See In re BH&P, Inc.*, 949 F.2d 1300, 1316-17 (3d Cir.1991) (In a case addressing conflict of interest issues with regards to estate Trustee and Trustee's professionals, Third Circuit stated: "denomination of a conflict as 'potential' or 'actual' and the decision concerning whether to disqualify a professional based upon that determination in situations not yet rising to the level of an actual conflict are matters committed to the bankruptcy court's sound exercise of discretion."). Attorneys often represent both husband and wife in separate bankruptcy filings and may even represent ex-spouses in their separate filings without a conflict arising. However, when the facts of the case show that there is an actual conflict, such representation is problematic. And while it is also true that in certain situations a conflict may be waived by the parties after full disclosure and informed consent, waiver of a conflict is not available in all instances. *RPC* 1.7(b).

In its submission on the conflict of interest issue, Applicant directs the court's attention to New Jersey Rule of Professional Conduct 1.7, quoting passages directly from the rule and explaining that the ethics rules allow for dual representation when a conflict of interest exists if there is full disclosure and informed consent. Based on this rule, Applicant argues that even if there is a conflict, the waivers signed by both parties makes any conflict of interest discussion moot. Conveniently, Applicant fails to include the text of the rule that explains not all conflicts may be waived.[9] New Jersey Rules of Professional Conduct 1.7 provides, *in its entirety*, the following:

---

[9] Applicant quotes *RPC* 1.7(a)(1) and (2) and (b)(1) and (2), but fails to quote (b)(3) and (4).

> (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
> (1) the representation of one client will be directly adverse to another client; or
> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client...
> (b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:
> (1) each affected client gives informed consent, confirmed in writing, after full disclosure and consultation...the consultation shall include an explanation of the common representation and the advantages and risks involved;
> (2) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
> (3) the representation is not prohibited by law; and
> (4) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal.

*RPC* 1.7(a),(b).[10] Subsection (b) of the rule is written with the conjunctive "and" and therefore, Applicant must satisfy all subsections of the rule, not just (b)(1) and (2).

Even proceeding under Applicant's abbreviated version of *RPC* 1.7, the consent letters provided to the court are insufficient to waive the conflict of interest in issue. The letters signed by Andrea and Joseph evidence each individual's understanding that through Joseph's bankruptcy, he could attempt to avoid his legal obligations to pay in accordance with the divorce agreement and that because such action could create a conflict of interest, Joseph agrees not to try and discharge the alimony, maintenance and support payments and Andrea understands this agreement. These waivers address dischargeability issues that arise in the context of Bankruptcy Code §523. The signed letters

---

[10]*RPC* 1.7 is derived from the former Disciplinary Rule 5-105.

do not address the conflict created by having the same attorney represent both individuals where the ex-wife is relying on her ex-husband to fund her Chapter 13 plan and mortgage payments and he is delinquent both pre and post bankruptcy.

Conflict of interest issues arise in situations where an attorney seeks to represent both husband and wife when they are filing for divorce. In a case decided under Disciplinary Rule 5-105, predecessor to *RPC* 1.7, the New Jersey Supreme Court sanctioned an attorney for violating the ethical rules "by representing both grievant and her husband in the divorce matter." *In re Breen*, 113 N.J. 522, 550 (1989). In a divorce case, it is unlikely that informed consent and waiver will cure a conflict since the separating parties are likely to have claims against each other for division of marital property and support. If that were the case, *RPC* 1.7(b)(3) would not be satisfied. Additionally, an attorney would be unable to maximize the recovery for one client without detriment to the other in violation of *RPC* 1.7 (b)(2). *See* Debra L. Bassett, *Three's a Crowd: A Proposal to Abolish Joint Representation*, 32 Rutgers L.J. 387, 425-27 (2001).

These same concerns are present when an attorney seeks to represent ex-spouses filing separate bankruptcy petitions. One spouse is likely to have a claim against the other for money owed pursuant to the divorce agreement. In such a situation, the conflict could not be waived since *RPC* 1.7(b)(4) requires that "the representation does not involve the assertion of a claim by one client against another client." Here, Andrea clearly has a claim against Joseph for alimony payments due and owing. Although Andrea's schedule of assets does not show a claim for alimony or child support against Joseph, Joseph scheduled Andrea as a priority creditor on his petition. The proof of claim filed by the mortgagee shows forty-one mortgage payments in arrears, suggesting Joseph was seriously in default of

his support obligations when Andrea filed bankruptcy. Furthermore, Joseph failed to pay his post petition support obligations leading to the mortgagee's motion for relief from the automatic stay. Proper representation of Andrea called for advice on her right to enforce Joseph's matrimonial obligations. That put Applicant squarely in the middle of two clients - a clear conflict of interest. The conflict is not waivable since one client (Andrea) has a claim against the other (Joseph).

Applicant states the majority of time billed for the stay relief motion was spent cajoling Joseph Nolan to make his alimony payments so that Andrea would be able to make the mortgage payments. As these excessive and repeated attempts remained unsuccessful, it seemed curious that no action was brought in matrimonial court to enforce the property settlement agreement. Applicant claimed such action would not produce results in time to save the Debtor's home. Applicant failed to mention that such an action would also cause Applicant to bring suit against its own client, Joseph Nolan. The unsuccessful attempts and lack of prosecution in enforcing the property settlement agreement are less surprising to the court now that it is aware of the dual representation. Services performed in this situation are not compensable.

## CONCLUSION

For the reasons set forth above, Applicant is entitled to keep the fixed fee of $2,500.00 charged for the normal and customary services that accompany the filing of a Chapter 13 petition. The amount of $165.80 is allowed for reasonable expenses. The request for an additional $6,966.60 is denied.

Dated: July 10, 2006 /S/Raymond T. Lyons
United States Bankruptcy Judge